AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Montana

**FILED**

JUN 1 8 2019

Clerk, U.S. District Court
District Of Montana
Helena

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| BRYAN GREGG WATERFIELD NASH | ) | Case No. MJ 19-38-M-JCL |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ June 8, 2019, and before _____ in the county of _____ Flathead _____ in the

_____ District of _____ Montana _____ , the defendant(s) violated:

| _Code Section_ | _Offense Description_ |
|---|---|
| 18 U.S.C. § 875 (d) | INTERSTATE COMMUNICATIONS/EXTORTION |
| 18 U.S.C. § 2261A | STALKING |

This criminal complaint is based on these facts:

See attached affidavit of Special Agent Mark D. Seyler, incorporated herein by reference.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Mark D. Seyler, Special Agent
_Printed name and title_

Sworn to before me and signed in my presence.

Date: June 18, 2019

_____
_Judge's signature_

City and state: _____ Missoula, Montana _____

Jeremiah C. Lynch, Magistrate Judge
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF A COMPLAINT

I, Mark D. Seyler, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since October 15, 1995.  Since that time, I have been assigned as Case Agent on a variety of federal criminal investigations, and have obtained and executed federal search and arrest warrants on numerous occasions.

2.    I submit this Affidavit under Rules 3 and 4 of the Federal Rules of Criminal Procedure in support of a Complaint and Warrant authorizing the arrest of Bryan Gregg Waterfield Nash.

3.    The statements in this affidavit are based on my personal investigation, training and experience, and information obtained by other agents, law enforcement officers, and witnesses.  Because this affidavit is submitted for the limited purpose of securing an arrest warrant, I have not included every fact known to me concerning this investigation.  I have set forth the facts I believe are necessary to establish probable cause to support the issuance of a warrant for the arrest of Bryan Gregg Waterfield Nash for violations of Title 18 U.S.C. § 875(d) (Extortion) and Title 18 U.S.C. § 2261A (Stalking).

1

## PROBABLE CAUSE

4.      Since October 2018, I have twice interviewed a wealthy investor (hereinafter referred to as Businessman 1), who is a resident of Whitefish, Montana. I have also reviewed several documents and other evidence provided by Businessman 1 to the FBI personally and through Businessman 1's attorneys. Other FBI agents and I have also interviewed a number of witnesses who corroborate Businessman 1's information, and have provided additional corroborating evidence.

5.      Bryan Gregg Waterfield Nash (hereinafter referred to as NASH) is a resident of San Mateo County, California. For several years prior to 2008, Nash had a friendly relationship with Businessman 1, who in 2008 also lived in California, where he was a partner in a successful California business (hereinafter referred to as Company A). In approximately 2008, Nash and Businessman 1 ended their friendly relationship after Nash's wife initiated divorce proceedings, and Nash blamed Businessman 1 for the breakup.

6.      In May 2013, NASH sent Businessman 1 a message asking Businessman 1 to pay NASH $250,000 to pay for legal fees (presumably associated with NASH's divorce).  On December 13, 2013, Businessman 1 received an e-mail from a Gmail address, which included a portion of Businessman

2

1's own name. The subject line read "Coming back at you," and the accompanying message threatened retaliation against Businessman 1, to include exposure of Businessman 1's alleged affairs and embarrassment for his business partners in Company A. (Note: Businessman 1, who has been married multiple times, admits to having consensual adult relationships with many women, sometimes outside of his marriages). In response to a Grand Jury Subpoena, Google indicated the Gmail account which generated this threatening email was opened on the same day the email was sent by someone using the name Bambi Starr. The IP Address used to open the account is registered to Stanford University (located less than 10 miles from Woodside, California, where NASH resides).

7.    Over the next two years (2013-2015), Businessman 1 received multiple emails accusing him of engaging in various affairs and other salacious activity. Although these emails were sent from addresses not registered to NASH, they contained language and themes consistent with numerous messages known to have been issued by NASH. During this time Businessman 1 received at least one e-mail from an account registered to NASH under his own name wherein NASH requested a multi-million dollar loan. In 2013, Businessman 1 believed NASH's communications represented extortion, and reported his concerns to local and federal law enforcement.

3

8.    In March 2016, Businessman 1 was forced to leave Company A after being named in a civil lawsuit. Businessman 1 continued to work with California law enforcement regarding NASH, and eventually (under law enforcement's instructions) sent messages agreeing to pay NASH approximately $15 million to end his harassment. Charges were never filed as a result of the California law enforcement investigation. Instead, Nash continued to send more text messages to Businessman 1, suggesting Nash would soon release damaging information regarding Businessman 1 to the public, and threatening Businessman 1 with criminal prosecution. Many of the messages suggested Nash was speaking with others in an attempt to develop incriminating information about Businessman 1. For example on July 16, 2016, Nash texted *"Why are your relatives reaching out to me?"* On June 23, 2016, he sent Businessman 1 a link to a Wikipedia article on Mail and Wire Fraud. On August 23, NASH texted *"once your game hits the press this all likely goes main stream media."* Businessman 1 has not responded to any of NASH's messages.

9.    In September 2016, Nash continued sending text messages from his cellular phone to Businessman 1, and began to also message Businessman 1's girlfriend (and future wife). In these text messages, NASH indicated he knew their whereabouts, including the tail numbers on their airplane, and exactly when and

4

where they were traveling at that moment. In one text message to Businessman 1's

girlfriend on October 11, 2016, NASH indicated he was inside her apartment

building. These messages, which Businessman 1 and his now wife have provided

to the FBI, caused Businessman 1 and his then girlfriend significant concern that

Nash was physically stalking them and had hacked their e-mail or social media

accounts.

10.    In November 2016, NASH filed a lawsuit, seeking to enforce the

agreement Businessman 1 had made earlier that April to pay NASH $15 million.

NASH's attorney dismissed this suit three months later after learning Businessman

1 had made the agreement at the direction of local law enforcement as part of an

investigation of NASH. This is the only lawsuit NASH is known to have filed

against Businessman 1 or Company A, although, as outlined below, he has

repeatedly threatened to file other civil actions against both.

11.    Throughout 2016 and 2017, Nash repeatedly sent Facebook messages,

text messages, and e-mails to Businessman 1 and Businessman 1's wives, ex-

wives, girlfriends, friends, and other associates accusing Businessman 1 of

soliciting prostitutes, rape and various other criminal and salacious activity. He

repeatedly threatened to "expose" this alleged conduct publicly. The FBI has

interviewed several of the individuals who received these interstate

5

communications from NASH during this time period, and they have confirmed receiving the messages and provided copies to the FBI when possible. A representative example of the messages sent by NASH was delivered to a friend of BUSINESSMAN 1's wife via Facebook messenger on October 19, 2017, and read in part *"(Name Redacted) is a prostitute . . . She flooded the place when he kicked her to the curb . . . (Name redacted) is a prostitute, he has a son with her (Name and age redacted). There are others . . . (Name redacted) a prostitute. . . There is a girl about to do a story as Jane D that was under 18 drugged and raped, she claims it was him and his friend. I expect criminal charges could follow."*

12.     Nash singled out Businessman 1's then girlfriend and future wife for frequent harassment, sending her text messages disparaging her boyfriend/husband, accusing her of being a prostitute, and threatening that he was talking with her friends and former coworkers. NASH's messages to Businessman 1's wife continued to arrive despite her repeated requests that he stop contacting her. For example on September 18, 2017, he sent her a message purporting to show a text conversation between two people discussing Businessman 1's alleged affairs and how he did not find his wife attractive. Businessman 1's wife's final attempt to convince NASH to stop came in December 2017, when she replied to one of his harassing messages about her husband with the following:

6

*I've made it very clear to you, repeatedly and in writing, that any*

*communication from you in any form is unwelcome. I repeat for the final*

*time - do not EVER contact me again! All texts, Facebook messages,*

*Instagram messages, and/or emails you have sent to me, my friends,*

*acquaintances or my family have been forwarded to law enforcement (both*

*federal and state). Any further communication will, at a minimum, result in*

*legal action under Montana Code Annotated (Privacy in Communication).*

13.    Despite this and similar requests by others to stop, in 2018 NASH continued to send more e-mails and text messages to Businessman 1's wife and Businessman 1 and his attorneys and associates threatening to make Businessman 1's alleged criminal and salacious activity public by either filing a lawsuit or going to the press. NASH contacted Businessman 1's church in Montana by telephone and via e-mail, making his usual salacious allegations, and advising the exposure of Businessman 1's alleged misbehavior would likely harm the church. He then taunted Businessman 1's wife via text message on June 28, 2018, informing her he had contacted her pastor with his allegations, *"Crimes against young girls have to be settled. All the facts . . . have been sent to (the pastor) . . . It's all true. Underage girls, the names of the illegitimate children and their mothers*

7

information . . . *Your background and pictures and investigative interviews from clients are on the way to (the pastor) too.* "

14.     NASH also sent dozens of messages to Businessman 1's daughter, sister, and close friends claiming Businessman 1 had committed crimes, fathered children with prostitutes, and engaged in other salacious and illegal activity. (NASH often accompanied these interstate communications with pictures of the alleged "prostitutes."). NASH's harassing text messages to family members and Businessman 1's wife have come in spurts, and have continued through at least May 17, 2019. One example, on September 16, 2018: *"It will be proved you are a prostitute. If you would have kept your mouth shut you wouldn't have been involved with this period. You disparaged me. Justice will prevail. The very young girl that took money for prostitution, way under age is almost ready to tell her parents and has been talking to the FBI and local authorities.* "

15.     From 2016 through 2018, NASH's threats were interspersed frequently with e-mails from NASH to Businessman 1 and Businessman 1's attorneys offering to meet and "settle," "end," or otherwise "resolve," this matter before NASH publicized his allegations. In these repeated interstate communications, NASH referenced how much Businessman 1 had allegedly cost him, and suggested he would take a *"reasonable offer,"* or *"discuss a settlement in*

8

*mediation.*" Businessman 1 did not respond, although Businessman 1's attorneys repeatedly asked NASH's attorney to prevent his client from contacting them or Businessman 1 directly.

16.    In October 2018, as NASH's usual harassing communications continued, he also sent emails to local and state law enforcement agencies alleging Businessman 1 had raped and killed multiple girls/women, some allegedly with the help of a local law enforcement leader. For example, in one email he stated, *"Sources and communications to me indicate (Name redacted) was about to go public and file a victim statement to authorities if (Businessman 1) did not settle with her . . . Claims are (Name redacted) was being paid for sex 8 years ago by (Businessman 1) at the age of (under the age of 18) . . .The paid for sex relationship soured after (Businessman 1) allegedly druged and sodomized her."* NASH also made these allegations in an email to the legal counsel for a Montana charitable organization with which Businessman 1 was affiliated. After a month of steadily escalating emails accusing Businessman 1 of criminal behavior and threatening to destroy him personally, on October 29, 2018, NASH sent an email to Businessman 1's attorney asking "What are his terms to settle?"

17.    On November 14, 2018, Businessman 1 received an email from an anonymous Protomail account, making numerous allegations and threats identical

9

to those raised by NASH over the past few years. Through my training and experience, I am aware Protonmail is used by individuals wishing to avoid law enforcement scrutiny, as it is hosted by a company in Switzerland which does not honor U.S. legal process. The email threatened Businessman 1 and his "hooker" wife had *"finally met your grim reaper and he waits at your door," and "now unleashes death and destruction on your world."* The following day, NASH sent harassing text messages from his cell phone to Businessman 1's wife, and followed with an email to Businessman 1's attorneys suggesting they lay out terms for *"settlement talks."*

18.    During the late summer and fall of 2018, Businessman 1 terminated his relationship with an employee who, among other responsibilities, had been in charge of security for Businessman 1 since 2013. This employee, hereinafter referred to as the Former Security Manager, had also been a close friend of Businessman 1, and Businessman 1 had contributed several million dollars to a business run by the Former Security Manager. In the fall of 2018, Businessman 1 cut funding to the Former Security Manager's company and evicted the Security Manager from an expensive home owned by Businessman 1. The Security Manager and Businessman 1 continue to dispute financial matters involving the dissolution of the Former Security Manager's company.

10

19.     While the Former Security Manager was helping to protect

Businessman 1, NASH was his family's largest safety concern, and the Former

Security Manager was intimately familiar with the effect NASH's communications

were having on Businessman 1 and his family. After Businessman 1 cut funding to

the Former Security Manager's company and evicted him, the Former Security

Manager and his attorneys began collaborating directly with NASH against

Businessman 1. NASH has voluntarily provided the FBI with an email he received

from one of the Former Security Manager's attorneys on November 9, 2018,

identifying herself as a friend of the Former Security Manager, and suggesting they

meet to chat regarding a *"common interest"* in *"bringing to heal . . . his former*

*employer and a piece of shit."* I have spoken to this attorney, as well as another

attorney representing the Former Security Manager, and they both indicated the

Former Security Manager's team began cooperating with NASH at approximately

this time. Since this collaboration began, NASH has repeatedly insinuated in his

communications he is receiving inside information from Businessman 1's Former

Security Manager.

20.     NASH's harassing texts, e-mails, and other communications to

Businessman 1 and his family and associates continued throughout the rest of 2018

and into 2019. In addition to Businessman 1's friends and family, NASH began

11

emailing one of Businessman 1's trusted employees, accusing them of complicity

in Businessman 1's alleged criminal activity "*the predator is going down, you may*

*need an attorney.*" Over the next few months, Nash would follow with additional

communications accusing this employee of billing fraud and suggesting they "*cut a*

*deal before it's too late.*" Nash also e-mailed an accountant who had worked for

Businessman 1 on November 23, 2018, threatening, "*Your client the sexual*

*predator appears to have your firm and himself in trouble.*" NASH also e-mailed

the accountant's employer accusing Businessman 1 and the accountant of tax

fraud. He also continued to email and send Facebook messages to leaders of

Montana charitable organizations with which Businessman 1 was affiliated,

accusing Businessman 1 of crimes involving young girls that, if exposed, would

embarrass the organizations. NASH continued to intersperse these threatening

communications with text messages and e-mails to Businessman 1's attorneys

urging them to settle with him.  For example, on December 1, 2018, he messaged

"*Last call. Filing,*" and on March 17, 2019, "*We have our witnesses. Please call*

*my attorney if you want to meet before I file. As you know, the deadline is soon.*

*This is criminal.*"

    21.    In approximately the spring of 2019, NASH became aware the FBI

had subpoenaed information regarding his e-mail and social media accounts. The

FBI purposefully did not seek a non-disclosure order for these subpoenas as NASH had already been informed his communications were being reported to law enforcement. At approximately the same time as he became aware of the FBI's subpoenas, NASH began adding a caveat to some of his messages to Businessman 1's attorneys, former business partners, and others, suggesting he had never asked for money. NASH also began contacting the FBI directly, even alleging (falsely) that I have a personal relationship with Businessman 1 and claiming I have stayed at Businessman 1's residence. NASH also claimed he was "hacked' and sent me dozens of text messages nearly identical to those provided by witnesses in this case.

22.    NASH's texts and emails to Businessman 1's attorneys, family, associated non-profit organizations, and other associates have continued until the drafting of this affidavit. As late as June 8, 2019, NASH sent a text message to one of Businessman 1's former business associates and friends in Flathead County, Montana, stating, "*Even with all of his (Businessman 1's) resources, he has no idea what's coming his way. I have spent millions legally pursuing peace for his victims. We know the truth about you . . . Get smart and I will use my leverage and resources to help you.*"

23.    The FBI has also interviewed partners, employees, and attorneys for

Company A in California (the firm which Businessman 1 was forced to leave in

March 2016), and they have provided copies of numerous e-mails and text

messages they received from NASH from 2016 through 2019.  Although they have

had sporadic contact with Businessman 1 since he left the company in 2016, they

have not shared most of their communications from NASH with Businessman 1,

nor have they coordinated extensively with Businessman 1 regarding problems

with NASH.

24.    In April 2016, shortly after Businessman 1 left Company A, NASH

began e-mailing partners and other employees at Company A seeking a job at the

firm. The leaders of Company A met very briefly with NASH and quickly

determined they would never hire him. After a few brief follow up conversations

with NASH, they retained outside counsel to handle any future contacts with

NASH. As with Businessman 1's attorneys, NASH disregarded requests to deal

only with Company A's attorneys, and continued to contact the firm's partners and

employees directly.

25.    Beginning in October 2016 and continuing through 2019, NASH sent

over 100 emails and text messages to Company A's partners, employees, and

attorneys suggesting Company A was somehow responsible for alleged

14

misbehavior by Businessman 1, which allegedly cost NASH millions of dollars. NASH repeatedly stated this information would become public when NASH filed a lawsuit or spoke to the press. He explicitly stated this public information would damage Company A's *"reputation."* As with Businessman 1, NASH constantly interspersed these threatening communications with offers to meet and "settle." For example on October 4, 2017, Nash contacted two partners claiming a specific journalist was going to write an article harming them all and that certain parties were trying to get him to divulge damaging information about Company A and Businessman 1. He suggested Company A pay him $10 million in legal fees so he could continue to keep Company A's name out of it.

26.    By December 11, 2017, and continuing through 2018 and 2019, NASH not only continued to insist Company A was somehow responsible for Businessman 1's alleged misconduct, he began to directly accuse one of Company A's other partners (hereinafter referred to as Businessman 2) of similar criminal, unethical, and salacious activity. In repeated threatening emails, NASH offered no details or proof, but only suggested people inside Company A were giving him information that would damage the reputations of Businessman 2 and Company A. NASH then continued to send e-mails and text messages to Company A's partners, employees, and attorneys alternatively threatening to harm to their reputation and

15

asking them to meet and settle. On July 6, 2018, Businessman 2 received an email from a new account, bryan.nash@outlook.com, wherein the sender (believed to be NASH) claimed to have details regarding the tail number on Businessman 2's airplane, his home address, and details regarding Businessman 2's family. This communication caused Businessman 2 significant concern for his family's safety. On October 8, 2018, Nash emailed Businessman 2 that one girl *"implicated"* him and another young girl claimed Businessman 2 was *"doing bad things, too."*

27.    Several of NASH's self-imposed deadlines passed, and he failed to receive a response to any of his demands to *"settle," "resolve,"* or *"wrap up,"* his situation with Company A. By the end of September 2018, NASH sent an email to Company A suggesting that a $100 million victims fund supported by Company A's industry be set up, from which Nash would collect a 30 percent administration fee. Again his demand was met with silence. Throughout the remainder of 2018 and into 2019, NASH continued to send e-mails and text messages to Company A's partners, employees, and attorneys threatening to expose their alleged complicity in multiple crimes and misdeeds. Frequently, he would send news articles about wealthy individuals and major companies who were facing public legal trouble regarding sexual harassment. In a February 2019 email, he threatened that Businessman 2's wife would now know what Businessman 2 had been doing.,

16

and in April 2019, confirmed this included "*reprehensible things to women and girls.*" NASH threatened he had "*recordings*" and "*witnesses,*" and was filing a lawsuit and that he was meeting with specific newspapers and specific reporters. These threats were followed by a number of other interstate communications from NASH setting deadlines and issuing settlement demands, which have continued until the drafting of this affidavit. For example on June 4, 2019, NASH sent an email to Businessman 2 threatening he was *a "center piece in my lawsuit with him (Businessman 1) because of the things hes done and the things that you've done its not my fault.*" On the same day NASH sent an email to Company A's attorney stating, "*1-day window to meet. I want a constructive outcome. Are you open tomorrow at 11 AM.*"

28.     NASH's pattern of interstate communications containing threats, harassment and extortionate demands have had a profound impact on the lives of those who have received them. Businessman 1 and Businessman 2 have greatly increased security outside their homes and workplaces, and they fear for the safety of their families. They, along with family, friends, and associates describe NASH's barrage of messages as "all consuming," and something they worry about every day. NASH's degrading emails to friends, family members, pastors, charity organizations, and law enforcement, coupled with his repeated threats to spread

17

accusations against them to the larger public have been agonizing not only to

Businessman 1 and Businessman 2, but to their families and friends. One NASH

message recipient reports having nightmares and losing significant sleep, while

another was forced to go on anxiety medication. Others have told the FBI they live

in constant fear that, even though false, NASH's allegations against them would

cause the loss of their reputations, businesses, and even families. The FBI has

interviewed at least 20 individuals in four different states who have received

harassing interstate communications from NASH, and nearly all have described a

significant interruption in their lives and changes in behavior and enjoyment as a

result of NASH's pattern of harassment.

29.    As noted throughout this affidavit, many witnesses have provided the

FBI with copies of the interstate messages they have received from NASH. The

majority of emails have come from two accounts, nash.bryan@gmail.com and

bryan.nash@gmail.com. Using Grand Jury Subpoenas, the FBI has obtained

subscriber information for those accounts, and they were registered under the name

of Bryan Nash. Most of the telephone text messages referenced herein were

received from telephone number 415-518-1828, which AT&T Wireless has

confirmed is also registered to NASH. I have reviewed toll records for this

telephone, and have confirmed it was used to make telephone calls to witnesses

and entities referenced in this affidavit, such as Businessman 1's church. Various

other e-mail accounts that were also used to send messages to Businessman 1 and

others were not registered under the name Bryan Nash, but there is no requirement

that a true name be listed when registering such accounts. Although NASH's name

is not on the subscriber information for these accounts, the content of the messages

distributed from them appears extremely similar to that of the many known NASH

messages, and they appear designed to accomplish the same harassing and

extortionate objectives.

30.    In his accusatory messages, NASH has offered few details regarding

the crimes he alleges were committed by Businessman 1 and others. He provided

names of at least two women in Montana who NASH alleged were raped and/or

killed by Businessman 1. One of the women is in fact, deceased, but has no known

connection to Businessman 1. In the abundance of caution, the FBI interviewed the

other woman, who NASH claimed was drugged and raped while she was underage.

The woman told the FBI no such crime was committed, but stated she has been

repeatedly contacted by NASH regarding the alleged crime.

31.    Title 18 U.S.C. § 875(d) reads "whoever with intent to extort from

any person, firm, association, or corporation, any money or other thing of value,

transmits in interstate or foreign commerce any communication containing any

19

threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years." As described above, since at least 2013, NASH has sent dozens, if not hundreds of interstate communications, specifically threatening to injure the reputation of Businessman 1, Businessman 2, Company A, and others. From NASH's numerous communications setting deadlines and seeking specific dollar amounts, employment, *"settlement," "mediation,"* and *"resolution,"* it is clear the intent of his threatening interstate communications has been to extort money and other things of value from Businessman 1, Businessman 2, and Company A. Furthermore, NASH has repeatedly threatened to accuse Businessman 1, Businessman 2, and other addressees of various crimes, including rape, murder, and fraud, something which is specifically prohibited 18 U.S.C. § 875(d).

32.    In relevant parts, Title 18 U.S.C. § 2261A reads, "Whoever . . . (2) with the intent to . . . harass (or) intimidate . . . uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that . . . (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a

20

person [defined as the person receiving the message, an immediate family member,

spouse or intimate partner] . . . shall be [imprisoned for not more than 5 years

pursuant to Section 2261(b)]. In this case, for at least the past six years, NASH has

established a pattern of sending harassing interstate messages threatening

recipients and their immediate families with criminal prosecution, public

humiliation, and veiled threats of violence. These continuing communications have

been intended to cause, and have caused substantial emotional distress to the

recipients and their immediate families.

## **CONCLUSION**

33.    Based on the foregoing, I respectfully submit this affidavit provides

probable cause to support the attached Complaint and requested Arrest Warrant for

Bryan Gregg Waterfield Nash for violations of Title 18 U.S.C. § 875(d) (Extortion)

and Title 18 U.S.C. § 2261A (Stalking).

*Respectfully submitted,*

Mark D. Seyler
Special Agent
Federal Bureau of Investigation

Subscribed and sworn
Before me on this 18ᵗʰ day of June, 2019

21

United States Magistrate Jeremiah C. Lynch

22