1    JoAnn Jett Corson
     Registered Diplomate Reporter
2    Certified Realtime Reporter
     P. O. Box 8006
3    Missoula, Montana 59807-8006
     406/829-7123 office
4    joann_corson@mtd.uscourts.gov

5    United States Court Reporter

6

7

8

9              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MONTANA
10                     MISSOULA DIVISION

11   UNITED STATES OF AMERICA,        )
                         Plaintiff,)
12        vs.                         )   No. CR 19-30-M-KLD
                                      )
13   BRYAN GREGG WATERFIELD NASH,     )   **TRANSCRIPT OF HEARING**
                         Defendant.)   **ON MOTION TO CHANGE PLEA**
14   _____)

15

16         **BEFORE THE HONORABLE KATHLEEN L. DeSOTO**
        **UNITED STATES DISTRICT COURT MAGISTRATE JUDGE**
17              **FOR THE DISTRICT OF MONTANA**

18

            Russell Smith United States Courthouse
19                    201 East Broadway
                  Missoula, Montana 59802
20                 Thursday, May 7, 2020
                    2:02 to 2:45 pm
21

22

23

24

              Proceedings recorded by digital audio recording
25        Transcript produced by computer-assisted transcription

1                              **APPEARANCES**

2   For the Plaintiff:            MR. RYAN G. WELDON
                                  Assistant U.S. Attorney
3                                 P.O. Box 8329
                                  Missoula, Montana 59807
4
    For the Defendant:            MR. JOHN RHODES
5                                 Attorney at Law
                                  Federal Defenders of Montana
6                                 125 Bank Street, Suite 710
                                  Missoula, Montana 59802
7

8

9                               **CONTENTS**

10  Proceedings .........................................    3

11  Transcriber's Certificate ...........................   39

12

13

14

15

16

17

18

19

20

21

22

23

24          TRANSCRIBER'S NOTE:  "Uh-huh" and "Um-hmm" indicate
    affirmative responses.  "Huh-uh" and "Hm-umm" indicate
25  negative responses.

```
1                         PROCEEDINGS
2        (Open court.)
3        (Defendant present via video teleconference.)
4            THE CLERK:  All rise.  The United States District
5   Court for the District of Montana is now in session, the
6   Honorable Kathleen L. DeSoto presiding.
7            THE COURT:  Please be seated.
8        (Discussion off the record between the Court and the
9         courtroom deputy clerk.)
10           THE COURT:  All right.  This is the time and place
11  set for a hearing on the motion to change plea in United
12  States of America v. Bryan Gregg Waterfield Nash.  It's
13  CR 19-30-M-DWM.
14           Good afternoon, Mr. Nash.
15           THE DEFENDANT:  Good afternoon, Your Honor.
16           THE COURT:  Can you hear me okay?
17           THE DEFENDANT:  I can.  Thank you.
18           THE COURT:  Okay.  And are you able to see me, too,
19  or is it just audio for you?
20           THE DEFENDANT:  I can see you.  You're distant, but
21  I can see you.
22           THE COURT:  Okay.  Well, that's okay.
23           All right.  So my understanding of what we're doing
24  here today, Mr. Nash, is there has been a superseding
25  information filed in your case that charges you with violating
```

1    Title 18, United States Code, Section 873.  And what you'd

2    like to do today here -- which is a Class A misdemeanor.  And

3    what you'd like to do today here is plead guilty to this

4    superseding information in front of me; is that correct?

5              THE DEFENDANT:  Yeah, that's correct, Your Honor.

6              THE COURT:  Okay.  And so I have here on the bench a

7    Consent to Proceed before a Magistrate Judge in a Misdemeanor

8    Case basically setting out that you consent to that and you

9    waive your rights to have this change of plea hearing as well

10   as sentencing conducted by an Article III, a district court

11   judge, and you agree to proceed before me today.  Is that

12   true?  Is that accurate?

13             THE DEFENDANT:  That's correct, Your Honor.

14             THE COURT:  Okay.  And then that signature that's

15   right under the, under the paragraphs stating what you're

16   waiving, is that your signature?

17             THE DEFENDANT:  That is my signature.

18             THE COURT:  Okay.  And then that has been consented

19   to as well by your attorney and by the government.  Okay?

20             THE DEFENDANT:  Okay.

21             THE COURT:  All right.  So generally, you know, we

22   would be doing this in person, but I think for you we've been

23   doing everything by video anyways, but I do want to go ahead

24   and get on the record that you consent to do this appearance

25   by video.  I know you asked for that, but I want to have that

1    formally in the record.

2          So do you agree to conduct this change of plea

3    hearing by video?

4          THE DEFENDANT:  I do, and thank you.

5          THE COURT:  Absolutely.

6          All right.  So, Mr. Rhodes, are you ready to

7    proceed?

8          MR. RHODES:  Yes, Your Honor.  Thank you.

9          THE COURT:  And, Mr. Weldon, are you as well?

10          MR. WELDON:  Yes, Your Honor.  Thank you.

11          THE COURT:  Okay.

12          So what I'm going to do now, Mr. Nash, is have you

13    raise your right hand, and the clerk will administer the oath

14    and place you under oath.  Okay?

15          THE DEFENDANT:  Okay.

16        (Oath administered to the defendant.)

17          THE COURT:  All right.  So, Mr. Nash, as we just

18    discussed, the purpose of this hearing today is really to

19    enter a guilty plea for you on the superseding information,

20    but to do that I have to be convinced that your guilty plea is

21    entirely voluntary and that it's being made on an informed

22    basis.  And so to do that I must be convinced that you

23    understand the nature of this charge that's contained in the

24    superseding information, the consequence that you face by

25    pleading guilty, the potential penalties that you face, as

1    well as the rights that you are waiving.  And I also must be

2    satisfied that the government could prove that charge of

3    blackmail against you, and the level of proof that they would

4    have to satisfy is beyond a reasonable doubt.

5              So that's the purpose of the hearing here today.  Do

6    you have any questions about what we're doing?

7              THE DEFENDANT:  Not yet.  Thank you, Your Honor.

8              THE COURT:  Okay.  And that's -- and I guess that's

9    one thing I should say.  It's a little weird when you're here

10   by video as opposed to in person, but if at any time you have

11   a question, you can feel free to stop and ask me.  It may be

12   something that you want to discuss with your attorney outside

13   of our presence, and we can certainly arrange for that as

14   well.  I just want to make sure you feel comfortable going

15   forward.  Okay?

16             THE DEFENDANT:  Okay.  Thank you, Your Honor.

17             THE COURT:  All right.  So I need to ask you some

18   background questions, and the point of these questions isn't

19   to pry unnecessarily into your personal life and

20   circumstances, but it's so that I have a sense of who you are

21   so that I can be confident that when I'm deciding whether your

22   change of plea -- or your plea, I guess I should say, is

23   informed and voluntary, that I have a basis to make that

24   decision.

25             So let me start first with how old you are.

1              THE DEFENDANT:  I am 56 years old.

2              THE COURT:  Okay.  And you are currently married; is

3    that correct?

4              THE DEFENDANT:  That is correct.

5              THE COURT:  And how many children do you have?

6              THE DEFENDANT:  Five.

7              THE COURT:  And do all five of those kids live with

8    you?

9              THE DEFENDANT:  Some of the time all five are

10   together.  Not always.

11             THE COURT:  Okay.  Let me ask you a different way.

12   Are you financially responsible for all five of the kids?

13             THE DEFENDANT:  Yes.

14             THE COURT:  Okay.  And what is the age range of

15   those children?

16             THE DEFENDANT:  Ten to 23.

17             THE COURT:  Okay.  And you're currently employed; is

18   that right?

19             THE DEFENDANT:  I am.

20             THE COURT:  And what exactly do you do?

21             THE DEFENDANT:  I'm head of strategy for a publicly

22   traded Fortune 1000 company.

23             THE COURT:  Okay.  And how long have you been with

24   that company?

25             THE DEFENDANT:  Five years.

1          THE COURT:  Have you -- and I know this was a

2    question before that, Mr. Rhodes, you might want to jump in

3    on, but have you ever been treated for mental health -- mental

4    illness, mental -- any kind of mental health issues?

5          Is he okay to answer, John?

6          MR. RHODES:  Yes, Your Honor.

7          THE COURT:  Okay.

8          THE DEFENDANT:  I have, Your Honor.

9          THE COURT:  Okay.  So can you briefly describe for

10   me what that is, what treatment you've received?

11         THE DEFENDANT:  Yes.  Bipolar depression.

12         THE COURT:  And are you currently medicated for your

13   bipolar depression?

14         THE DEFENDANT:  I am.

15         THE COURT:  And what, what medications do you take?

16         THE DEFENDANT:  Fluoxetine, Zyprexa, and I'm going

17   to be starting a new medication, BuSpar.

18         THE COURT:  All right.  And are the two that you're

19   already are -- or currently on, I guess I should say, are

20   those medications that you take every day?

21         THE DEFENDANT:  They are, Your Honor.

22         THE COURT:  And have you taken them today?

23         THE DEFENDANT:  I have taken them today.

24         THE COURT:  And so is there anything about those

25   medications or your reactions to those medications that

1    interferes with your ability to understand and process what

2    we're doing here today?

3              THE DEFENDANT:  No, Your Honor.  I believe it helps

4    improve my ability to process what we're doing today.

5              THE COURT:  All right.  Other than those

6    medications, are you under the influence of any alcohol or any

7    other type of medication or narcotic?

8              THE DEFENDANT:  No, Your Honor.

9              THE COURT:  Okay.  Do you have a copy -- I know

10   you're sitting in your car, it looks like, but do you have a

11   copy of the superseding information there with you?

12             THE DEFENDANT:  I have a copy of the proof, Offer of

13   Proof in Support of Guilty Plea.

14             THE COURT:  All right.  And we'll get to that in

15   just a second.  Let's talk about the superseding information

16   first.

17             So you're charged in the superseding information

18   with violating Title 18, United States Code, Section 873.

19   That's blackmail.  And the maximum penalty for that charge,

20   which is a Class A misdemeanor, is one year imprisonment -- up

21   to one year imprisonment, a $100,000 fine, and one year of

22   supervised release.  And then there's also a $25 special

23   assessment that comes into play at the time of sentencing.

24             Do you have any questions about the maximum

25   penalties that you face to the charge of blackmail as

1    contained in the superseding information?

2            THE DEFENDANT:  No, Your Honor.  I understand the

3    maximum penalties.

4            THE COURT:  Okay.  And it's my understanding -- I'll

5    talk about this a little bit more in detail later, but it's my

6    understanding that part of this plea agreement envisions, at

7    the time of sentencing, the United States moving to dismiss

8    both the indictment, the original indictment, as well as the

9    superseding indictment.  Is that your understanding as well?

10           THE DEFENDANT:  That is my understanding,

11   Your Honor.

12           THE COURT:  Okay.  So have you had the chance to

13   discuss this case with Mr. Rhodes?  And by that I mean all the

14   facts that the government would have to prove in order to get

15   a guilty conviction in your case?

16           THE DEFENDANT:  I have had meetings with my

17   attorney, Mr. Rhodes, several times discussing those points.

18           THE COURT:  All right.  And have you had a chance to

19   discuss all the evidence the government has or problems with

20   the evidence that your attorney might think the government has

21   in proving their case against you?

22           THE DEFENDANT:  Yes, we've discussed both those.

23           THE COURT:  Have you had sufficient time to meet

24   with Mr. Rhodes to discuss all the options in your case?

25           THE DEFENDANT:  I have, Your Honor.

1          THE COURT:  And so generally what happens is after

2    somebody gets charged, there's an exchange of information from

3    the government to the defendant, and we call that discovery.

4    And it can be reports.  It can be cell phone information.  It

5    can be texts.  It can be emails, computer printouts.  All

6    kinds of things.  Usually -- I understand this case is

7    probably fairly document-intensive.  Were you able to review

8    the discovery or a summary of the discovery with Mr. Rhodes

9    prior to today?

10         THE DEFENDANT:  Yes, we did review much of the

11   government discovery.

12         THE COURT:  And so if you had any questions, either

13   about any aspect of the charges that were contained in either

14   of the indictments or any of the facts that were contained in

15   the discovery, were you able to ask those questions of

16   Mr. Rhodes?

17         THE DEFENDANT:  Yeah, to the best of my ability, I

18   was.

19         THE COURT:  All right.  So when you say to the best

20   of your ability, was there something that interfered with your

21   ability to ask him questions?

22         THE DEFENDANT:  Well, sometimes I didn't understand

23   what questions to ask, and so I didn't know what to ask, not

24   being familiar with the legal system.

25         THE COURT:  Sure.  Absolutely.  And so -- and as you

1  kind of went, went through this case and kind of worked your

2  way through it, were you able to kind of, you know, identify

3  issues, maybe, or speak about issues that you had with

4  Mr. Rhodes?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  And so as you sit here today, do you

7  feel confident that you have a good understanding of the facts

8  in the case and any of the legal issues that you wanted to

9  discuss?  Do you feel like you have a good understanding of

10  that?

11          THE DEFENDANT:  I do, Your Honor.

12          THE COURT:  All right.  And are you satisfied with

13  the representation that Mr. Rhodes has given you?

14          THE DEFENDANT:  I am, Your Honor.

15          THE COURT:  Okay.  Thank you.

16          And as we sit here today, do you need any additional

17  time to talk about anything with Mr. Rhodes before we proceed

18  in this hearing?

19          THE DEFENDANT:  Not at this point, Your Honor.

20  Thank you.

21          THE COURT:  Okay.  And like I said, if you ever have

22  a need to do that, just let me know and we can arrange for

23  that.  Okay?

24          THE DEFENDANT:  Okay.  Thank you.

25          THE COURT:  All right.  So we just talked about the

1    maximum penalties, and I don't even know if this applies in

2    your case, but there's no parole in the federal system.  So if

3    you were, if you were to be sentenced to a period of

4    incarceration, that's the sentence that you would generally

5    serve.  I don't think that's probably a huge issue in this

6    case, but I need to advise you of that.

7                Have you discussed with your attorney what

8    supervised release is?

9                THE DEFENDANT:  Yes, I have, Your Honor.

10               THE COURT:  So tell me what you understand it to be.

11               THE DEFENDANT:  That I will be working with a

12   probation officer on a regular cadence, checking in and

13   providing information at their request.

14               THE COURT:  Yeah, that's basically it.  And I know

15   that in the plea agreement there's an agreement by the parties

16   that a recommended sentence would be five years of probation.

17   And to, to a large degree, probation and supervised release

18   are the same thing.  The only distinction is that supervised

19   release occurs if you were to receive any sort of jail time.

20   Supervised release, that's the period of time that's -- that

21   you're under supervision afterwards.

22               But the way you described it is how probation works.

23   And if you were to receive a probationary sentence in this

24   case, you would be required to work with the probation office

25   in the district in which you were located at the time, and

1   there would be some conditions that you would have to abide

2   by, including, you know, not violating any additional laws.

3   If there was any financial information or additional,

4   additional conditions that the probation office felt was

5   necessary, they would impose those con- -- I would impose

6   those conditions at the time of sentencing, and then you would

7   be required to abide by those conditions for the term of your

8   probation.  Do you understand that?

9           THE DEFENDANT:  I understand that, Your Honor.

10          THE COURT:  Okay.  And then, of course, there are

11  consequences if you violate those terms of condition -- those

12  conditions.  And what could happen is you could be brought

13  back before the Court and, if you had been sentenced to a

14  probationary sentence, you could then be sentenced to a term

15  of incarceration.  Do you understand how that would work?

16          THE DEFENDANT:  I understand that, Your Honor.

17          THE COURT:  Okay.  Do you have a copy of the plea

18  agreement there with you?

19          THE DEFENDANT:  I do not have a paper copy of the

20  plea agreement.

21          THE COURT:  Okay.  Well, so, that complicates it a

22  little bit but not too much.  I think I can work my way

23  through this with you.  And if you have a question about

24  something, I can certainly read it out loud to you.  Okay?

25  Not the whole plea agreement, but if there's a question about

1    a provision in the plea agreement that we're talking about, I

2    can certainly read it out loud to you, and that would help.

3    All right?

4            THE DEFENDANT:  Okay.  Thank you, Your Honor.

5            THE COURT:  Okay.  So just for the record, the plea

6    agreement that I have is eight pages long.  There are, at the,

7    at the eighth page, or on the eighth page, there are a series

8    of lines for signatures.  It's signed by Timothy Racicot for

9    the United States attorney, it's signed by you, and then it's

10   signed by your counsel John Rhodes.

11           However, there is -- you omitted the date on that

12   signature, but is it fair for me to presume that you signed it

13   on or before approximately March 26, 2020?

14           THE DEFENDANT:  That would be correct, Your Honor.

15           THE COURT:  Okay.  And then on the left-hand side --

16   or, I'm sorry, on the left-hand bottom corner of each page

17   there are a series of lines with initials over them, including

18   for the United States -- assistant United States attorney,

19   yourself, and your attorney.  And it looks like you signed all

20   of them except for -- or initialed all of them except for the

21   final page.  But is it fair for me to assume that you meant to

22   initial the final page?

23           THE DEFENDANT:  Your Honor, I did mean to sign all

24   pages and date it.

25           THE COURT:  Okay.  And then so what did you intend

1  to signify by initialing each of the pages?

2          THE DEFENDANT:  That I was in agreement to the

3  document and each of the pages.

4          THE COURT:  Okay.  Did you intend to let me know

5  that you had read and understood all of the pages in the plea

6  agreement?

7          THE DEFENDANT:  I did understand it, and I did read

8  all of the pages in the plea agreement, yes, Your Honor.

9          THE COURT:  Okay.  And so does this agreement that I

10 have that you signed, is it the entire agreement that you have

11 with the United States?

12         THE DEFENDANT:  To the best of my knowledge, that,

13 that would encompass the agreement --

14         THE COURT:  Okay.

15         THE DEFENDANT:  -- the final plea agreement.

16         THE COURT:  Okay.  And so what I mean by that is

17 there's no side deals or something that's not written down

18 that you expect to get in exchange for this guilty plea,

19 right?

20         THE DEFENDANT:  No, there are none that I'm aware

21 of.

22         THE COURT:  All right.

23         So, Mr. Weldon, would you please outline the

24 essential terms of this agreement?

25         MR. WELDON:  Yes, Your Honor.

1          In this case, the defendant will be pleading guilty

2     to the sole count in the superseding information.  The plea

3     agreement was negotiated under 11(c)(1)(A) and (B).  And for

4     the benefit of the defendant, that means that the United

5     States will dismiss both the original indictment as well as

6     the superseding indictment, and, in exchange, we will also

7     make some recommendations.  Those recommendations, Your Honor,

8     are contained in paragraph 6, and it's the standard 2 levels

9     for acceptance of responsibility, so long as there isn't

10    anything inconsistent with acceptance of responsibility, and

11    an additional 1 level if appropriate under the guidelines.

12         And then this agreement is a little different in

13    that the parties are jointly agreeing to recommend a sentence

14    of probation for five years.  The parties do reserve the right

15    to make any other arguments at the time of sentencing, and the

16    defendant understands that the Court is not bound by those

17    recommendations.  There also is a general waiver of appeal in

18    this plea agreement, Your Honor.

19         THE COURT:  Okay.

20         And, Mr. Rhodes, do you agree that that describes

21    the essential terms of this agreement?

22         MR. RHODES:  Yes, Your Honor.

23         THE COURT:  And, Mr. Weldon, I'm sorry.  I meant to

24    ask you as well:  Is this the most favorable agreement that

25    was sent to the plaintiff -- the "plaintiff" -- the

1  defendant --

2          MR. WELDON:  Yes, Your Honor.

3          THE COURT:  -- in writing?

4          MR. WELDON:  In this case, this was by far the most

5  favorable agreement.

6          THE COURT:  And, Mr. Rhodes, I'm assuming you agree

7  with that?

8          MR. RHODES:  Yes, Your Honor.

9          THE COURT:  Okay.  So, Mr. Nash, has anyone made any

10 promises to you that are not contained in the four corners of

11 this agreement in an effort to get you to take it?

12         THE DEFENDANT:  No, Your Honor.

13         THE COURT:  Has anyone threatened you or your family

14 or coerced you in an effort to get you to take this plea

15 agreement?

16         THE DEFENDANT:  No, Your Honor.

17         THE COURT:  So I want to talk about a couple of the

18 provisions.  The first one that Mr. Weldon just mentioned

19 is -- we call it the nature of the agreement, and basically it

20 just sets out which rules of criminal procedure apply to this

21 agreement.  And as Mr. Weldon noted, this plea agreement is

22 governed by 11(c)(1)(A) and 11(c)(1)(B) of the rules of

23 criminal procedure.

24         And what that essentially means is that if the

25 government, as it has agreed to do, moves to dismiss the

1    original indictment and the superseding indictment and then

2    makes those recommendations about the guideline levels that he

3    mentioned as well -- and we'll talk about those in a second --

4    if all of that happens and the Court agrees to dismiss the

5    original and superseding indictment, you won't have the

6    ability to withdraw from this plea agreement, even if it turns

7    out in a way that you don't want.  Do you understand that?

8                  THE DEFENDANT:  I do, Your Honor.

9                  THE COURT:  Okay.  And the recommendations that the

10   government has agreed to make, those are contained in

11   paragraph 6, and it's that the United States will recommend a

12   downward -- well, a decrease, I guess, by 2 levels for the

13   acceptance of responsibility, an additional 1 under certain

14   circumstances if it was applicable.  But I think probably the

15   recommendation that means the most to you is that the parties

16   agree jointly to recommend a sentence of probation for five

17   years.

18                  But do you understand that if for some reason the

19   Court did not agree to go along with that recommendation and

20   you were sentenced to a period of incarceration, that you

21   wouldn't have the ability to withdraw from this plea

22   agreement?

23                  THE DEFENDANT:  I do, Your Honor.

24                  THE COURT:  Okay.  I want to talk to you now about

25   the constitutional rights that you're going to be waiving by

1   choosing to plead guilty.  You generally have the right to go

2   to trial by jury, but by virtue of this waiver that you

3   signed, you have waived that right.  So what you would be

4   entitled to is to go to a trial in front of me, the judge, and

5   what would happen if you wanted to go to trial in this matter

6   is the United States would go first.  It bears the burden of

7   proof.  And the United States would present witnesses that

8   would come forward, provide testimony.  They would admit

9   evidence.

10          Your attorney on your behalf would have the ability

11  to cross-examine all of those witnesses and challenge all of

12  that evidence.  Then your attorney would have the chance to

13  go, and he could present witnesses and evidence on your

14  behalf.  If the witnesses you wanted to have show up to trial

15  would not voluntarily come here, your attorney could ask the

16  Court to issue subpoenas, which we would do, and then those

17  subpoenas would go out, the United States marshal would get

18  those witnesses, and they would bring them in here to testify.

19  So your attorney could put on those witnesses and present

20  evidence.  Of course, the United States would have the right

21  to challenge the evidence and cross-examine those witnesses.

22          You, yourself, would also have the right to testify

23  at trial if you wanted to do that, but you also have the

24  absolute right to not testify at trial.  And if you chose to

25  remain silent and not testify at trial, the Court would

1   instruct -- well, I guess I would understand that your

2   decision to not testify could not be held against you.  And so

3   what that means is that if you chose to not testify, I could

4   not and would not consider that in any way, shape, or form

5   when determining if you were guilty or innocent.

6          So if you went to trial, you would be presumed

7   innocent as a matter of law.  I would understand that the

8   charge against you must be proven by the government and that

9   the government would have to establish guilt beyond a

10  reasonable doubt.  And then if you were convicted, you would

11  have the right to appeal that conviction.

12         You also, of course, as we talked about earlier,

13  would have the right to have the District Court conduct this

14  change of plea hearing, but you have waived that right as

15  well.

16         Do you understand those rights?

17         THE DEFENDANT:  I do, Your Honor.

18         THE COURT:  Do you have any question about that?

19         THE DEFENDANT:  Not at this time, Your Honor.

20         THE COURT:  Okay.  So we've already talked about

21  that there's no parole.  I don't think that's really

22  applicable in this case, but I want to talk to you for a

23  moment about the sentencing procedure.  And I'm sure

24  Mr. Rhodes has discussed that with you.

25         But essentially sentencing in the federal court is

1    governed by a statute.  It's 18 United States Code

2    Section 3553(a).  And what it requires the Court to do is

3    fashion a sentence that is sufficient but no greater than

4    necessary, and there's a whole list of factors that the Court

5    will consider, and that includes your background, the nature

6    of the crime, any applicable policy statements.

7            But one of the things that the Court must consider

8    is the United States Sentencing Guidelines.  It used to be

9    that those guidelines were mandatory, and now they're

10   advisory, but the Court is still required to first calculate

11   them accurately and then, second, consider them when putting

12   together a sentence that is sufficient but no greater than

13   necessary.

14           So have you had the chance to talk to Mr. Rhodes

15   about the sentencing guidelines and how they work?

16           THE DEFENDANT:  I have, Your Honor.

17           THE COURT:  So tell me what -- tell me your

18   understanding of how the guidelines work.

19           THE DEFENDANT:  My understanding is that the

20   recommendation in the plea agreement is simply a

21   recommendation by both parties and that the judge, you, would

22   make the determination as to what the ruling would be on the

23   sentencing.

24           THE COURT:  I think that's true mechanically, but

25   the sentencing guidelines in particular are -- it's a system

1    that the Court has to consider, and it's one of the factors

2    that the Court considers.  But what it is is basically for the

3    federal crimes that exist for all the statutes, there's a

4    corresponding guideline, and so there's different ones for

5    different statutes and so forth.  And that is -- it correlates

6    to a number, okay, your offense level.  And there are certain

7    things that can make that go up or down.

8              I did look up the guideline in this particular case,

9    and I think, like a lot of, a lot of charges that are similar

10   to this, it is affected to some degree at least by the amount

11   involved.  And I don't know what that amount is, but that,

12   that can make the number go up.  Then there's a series of

13   other things that can and might make the number go up or down

14   even more.  It's different in every single case.

15             But after all of those calculations, what you have

16   is an adjusted offense level.  And if you look at -- have you

17   ever seen the sentencing chart, the guideline chart?

18             THE DEFENDANT:  I did some time ago.

19             THE COURT:  Sure.

20             THE DEFENDANT:  The different quadrants, yeah.

21             THE COURT:  Exactly.  And so what you have is a

22   series of numbers on the left, and those are the offense

23   levels.  And on top are Roman numerals, and those represent

24   your criminal history.  And the way that's calculated is the

25   probation office will look at -- or get information relating

1    to all of your contacts with law enforcement.  Some things are

2    scored and some things are not scored.  At the end of all that

3    information-gathering, you have a number that corresponds to a

4    criminal history category, and then where the criminal history

5    category and your adjusted offense level, where those two

6    things meet up, that is your guideline range, and it's

7    expressed in months, and so those are the numbers that make up

8    those quadrants.

9         Do you have any question about how that works?

10         THE DEFENDANT:  Well, in theory I understand how it

11   works, but there's, you know, a great deal of detail that goes

12   into it that I'm not familiar.

13         THE COURT:  I think pretty much everyone in the room

14   would say that.  Every time --

15         THE DEFENDANT:  Yeah.

16         THE COURT:  Every time when I, when I was on the

17   other side of this, whenever I would be trying to calculate

18   guidelines for a client, I would always have to say, "You

19   know, this is my best guess," because there's a lot of moving

20   parts in these and things go up or down.  And as we sit here

21   right now, I think probably none of us has a completely

22   accurate, a hundred percent accurate view of that.

23         But I'm gonna ask your lawyer right now if he's had

24   the chance to calculate a preliminary guideline estimate.

25   Okay?

1          THE DEFENDANT:  Okay.  Thank you, Your Honor.

2          THE COURT:  Mr. Rhodes.

3          MR. RHODES:  Yes, Your Honor.

4          As you referenced, the intended loss is referenced

5    in 2B1.1, and, here, I wouldn't be surprised if the intended

6    loss comes out into the millions of dollars.  The bottom line

7    is no money was exchanged, however.

8          THE COURT:  Okay.

9          MR. RHODES:  So I think what's gonna happen with the

10   guidelines is they're gonna top out at the statutory maximum.

11   And we're gonna argue that the guidelines are anomalous

12   because they could be based on intended loss when, in reality,

13   there was no money exchanged.

14         THE COURT:  Okay.

15         So as you can tell -- could you hear?  Could you

16   hear Mr. Rhodes okay?

17         THE DEFENDANT:  I could, Your Honor.

18         THE COURT:  Okay.  So as you could tell, there might

19   be some dispute about how that's calculated, an intended loss

20   versus actual loss making an issue.  So what Mr. Rhodes has

21   done is kind of give, give -- I'm sure he gave this to you

22   before and he just certainly just gave to me -- sort of the

23   best guess of where we're going to end up at the time of

24   sentencing.  But do you have any questions about how that, how

25   the process works?  Maybe not how exactly we get there but the

25

1  basic process of how guidelines work within the sentencing

2  grid?

3           THE DEFENDANT:  Yeah.  I have a basic understanding.

4  I wouldn't say I have a competency understanding.

5           THE COURT:  And I, honestly, I wouldn't expect you

6  to.  I think basic is good enough for now.  Okay?

7           Uh-oh.

8           THE CLERK:  Uh-oh.

9      (Pause.)

10          THE DEFENDANT:  Okay.  Are you still there?

11          THE COURT:  Well, I can hear you.  I can't see you.

12 But can you hear me?

13          THE DEFENDANT:  I can hear you and see you.

14          THE COURT:  Oh.  Okay.

15          Well, Mr. Rhodes, are you okay going forward with me

16 not being able to see him?

17          MR. RHODES:  Yes, Your Honor, as long as Mr. Nash

18 is.

19          THE COURT:  Okay.

20          So, Mr. Nash, I can hear you --

21          THE DEFENDANT:  Yeah.

22          THE COURT:  -- just fine, but I can't see you at

23 all.  Are you comfortable proceeding right now with, with

24 this, just with audio as opposed to with me not being able to

25 see your face?

1          THE DEFENDANT:  I am comfortable as long as I can

2     hear you, Your Honor, correct.

3          THE COURT:  Okay.

4          Mr. Weldon, are you okay with that as well?

5          MR. WELDON:  Yes, Your Honor.  Thank you.

6          THE COURT:  Okay.

7          All right.  So at this point, Mr. Weldon, would you

8     please explain the legal elements of the offense?

9          MR. WELDON:  Yes, Your Honor.

10          There are two elements in this offense:

11          First, the defendant knowingly demanded or received

12     a thing of value; and

13          Second, he did so under a threat of informing, or as

14     consideration for not informing, against a violation of a law

15     of the United States.

16          THE COURT:  All right.

17          Mr. Rhodes, do you agree that's a correct statement

18     of the legal offense?

19          MR. RHODES:  Yes, Your Honor.

20          THE COURT:  Or the elements.  I'm sorry.

21          Okay.  So, Mr. Nash, there has been an offer of

22     proof in this case, and all an offer of proof is really is a

23     summary of the evidence the United States believes it could

24     show if it went to trial in this case.  And so I think you

25     referenced earlier that you have that with you?

1           THE DEFENDANT:  I do, Your Honor.

2           THE COURT:  Okay.  And have you had a chance to

3    review that with Mr. Rhodes?

4           THE DEFENDANT:  I did --

5           THE COURT:  Okay.

6           THE DEFENDANT:  -- Your Honor.

7           THE COURT:  So, Mr. Weldon, would you please

8    describe the proof the government would present if it had to

9    go to trial on this count?

10          MR. WELDON:  Yes, Your Honor.

11          If this case proceeded to trial, the United States

12   would prove that Mr. Nash has known the victim in this case,

13   John Doe 1, for many years.

14          Beginning in approximately December of 2013 and

15   continuing until approximately June of 2019, Mr. Nash

16   frequently communicated with John Doe 1 in person and

17   electronically by sending email and text messages and with

18   family, friends, and colleagues of John Doe 1.

19          Many of Mr. Nash's communications demanded money

20   from John Doe 1, and he also accused John Doe 1 of committing

21   federal crimes; specifically, Mr. Nash alleged John Doe 1

22   could be investigated by the IRS for tax fraud.  For example,

23   Mr. Nash sent a text message to John Doe 1 on March 15, 2016

24   stating, quote, You have IRS exposure, too, end quote.

25          Mr. Nash sent another text message in April of 2016

1    telling John Doe 1, quote, This brings all your IRS stuff to

2    the public eye even more.  This will be huge news.  You were

3    scamming the IRS, end quote.

4          During the same time period Mr. Nash was accusing

5    John Doe 1 of breaking federal law, he also repeatedly asked

6    for financial assistance.  When John Doe 1 stopped responding

7    to communications from Mr. Nash, Mr. Nash intensified

8    communications with John Doe 1's friends, family members,

9    employees, and privately retained lawyers.  Many of those

10   messages referenced John Doe 1 being investigated by the IRS

11   or FBI, and Mr. Nash repeatedly asked to meet with John

12   Doe 1's lawyers in order to, quote, settle, end quote, with

13   John Doe 1.  Mr. Nash's requests to settle with John Doe 1

14   were in consideration for not filing a civil complaint against

15   John Doe 1 or reporting his alleged criminal transgressions to

16   law enforcement.

17         If this case proceeded to trial, Your Honor, that

18   would be the evidence the United States would offer.

19         THE COURT:  All right.

20         So, Mr. Nash, were you able to hear everything

21   Mr. Weldon just said?

22         THE DEFENDANT:  Yes, Your Honor.

23         THE COURT:  And do you disagree with anything that

24   he said?

25         THE DEFENDANT:  The general nature of what he said

1    is true.  The IRS piece was in the newspaper already, related

2    to the lawsuit that John Doe was involved with.  That had

3    already become public.  So there's, there's some things on

4    here that were, were public already.

5            THE COURT:  Okay.  So, so I guess what I'd like to

6    hear from you is an explanation of why you think you're guilty

7    of the charge to which you're pleading guilty here today.  So

8    even though -- I mean, I guess what I'm hearing is that maybe

9    you have some quibble with when some of the IRS information

10   was made public, but I need to hear from you that you

11   understand that you are, in fact, guilty and what facts you

12   believe support your guilty plea.

13           THE DEFENDANT:  Okay, Your Honor.

14           This is a very long, protracted situation going back

15   to 2007, possibly.  I believed my life was in danger.  I was

16   very fearful of John Doe and the threats, credible threats,

17   and the people that had contacted me and told me that he

18   wanted to kill me.  I was afraid of that.

19           I, I was very anxious.  I tried to communicate with

20   John Doe's attorneys.  I started demanding that he leave me

21   alone and that he pay me money that I believed he owed me.

22           At the time, I didn't realize that was blackmail and

23   that I was breaking the law.  I just wanted him to pay me what

24   I believed he owed me and to leave me alone.

25           THE COURT:  Okay.  So let me ask you this:  Do you

1  understand now that what you did is blackmail under the law?

2          THE DEFENDANT:  I do, Your Honor.

3          THE COURT:  Okay.  And so when -- although at the

4  time you may not have known it was a violation of the law, did

5  you, did you, when you demanded this money, did you do so with

6  a threat to basically inform or tell on John Doe 1 for what

7  you believed was a violation of federal law?

8          THE DEFENDANT:  Yes, Your Honor.  I, I told him that

9  I wanted him to leave me alone and that I was going to contact

10 the authorities, which I did, and I told him I was going to do

11 that if he didn't leave me alone and pay me what he owed me.

12         THE COURT:  Mr. Rhodes.

13         MR. RHODES:  Your Honor, I think that satisfies the

14 elements.

15         THE COURT:  Okay.

16         MR. RHODES:  It's admitting that he demanded money

17 under the threat of reporting John Doe if he didn't receive

18 the money.

19         THE COURT:  Okay.  All right.

20         Okay.  So, Mr. Nash, based on the discussions that

21 we've had here today, I'm going to ask you now:  How do you

22 plead to the sole count of the superseding information?

23         THE DEFENDANT:  Guilty, Your Honor.

24         THE COURT:  All right.

25         I find that you are fully competent and capable of

1   entering an informed and voluntary plea, that you understand

2   the nature of the charge to which you have just pled guilty,

3   that you understand the consequences of pleading guilty here

4   today as well as the maximum punishment that you may face for

5   pleading guilty here today.  I find that you fully understand

6   the constitutional rights that you are waiving here by

7   pleading guilty here today.  I find that you have had adequate

8   time to review the plea agreement with your attorney,

9   Mr. Rhodes, that you understand all of the provisions of the

10  plea agreement, and that all of the statements in the plea

11  agreement are true.

12          I find that your guilty plea is knowing and

13  voluntary, supported by an independent basis in fact which

14  would establish each of the essential elements of the crime.

15  And I also find that if I sat through a trial and listened to

16  the evidence that Mr. Weldon said that he could prove, that I

17  would find you guilty beyond a reasonable doubt.

18          And so for those reasons, I will accept your guilty

19  plea.

20          Sentencing.  We alluded to it a little bit, but

21  basically the way sentencing works unless -- and I'd like to

22  hear from the parties on this.  Generally how sentencing would

23  work is there would be a full-blown presentence investigation

24  which results in a presentence investigation report which

25  comes to the Court, and at that time sentencing occurs.

1                John and Ryan, have you spoken about what you would

2      like to do?

3           (Discussion off the record.)

4           MR. RHODES:  Can I confer with Mr. Weldon,

5      Your Honor?

6           THE COURT:  Certainly.

7           (Discussion off the record.)

8           MR. WELDON:  Your Honor, I think that we're fine

9      working with the probation office.  We want to make sure -- I

10     think the one issue that we're most concerned about from the

11     government's perspective is the mental health history of the

12     defendant.

13          THE COURT:  Okay.

14          MR. WELDON:  We just want to make sure that we have

15     that cataloged and we can address any concerns.

16          THE COURT:  All right.  So do you have a --

17          MR. RHODES:  Your Honor, I think not doing a

18     full-blown PSR would fit the situation, but I understand

19     Mr. Weldon's concern.  So if there was a way to do a lesser

20     PSR but have the mental health concerns addressed in it, that

21     would be our request.

22          THE COURT:  I think, from speaking with Mr. Hogan

23     earlier, I don't think that that would -- so, so the two

24     options that I would have are, you know, having the

25     presentence report done without the background, which is a

1    much shorter timeline, obviously.  My understanding from

2    talking to Mr. Hogan -- and, Brian, you can maybe tell me if

3    I'm wrong -- that if we're going to do the background, even

4    the mental health, we would need the time to go forward as if

5    it was a full-blown PSR, so I would probably just go ahead and

6    order the full-blown PSR.

7               PROBATION OFFICER HOGAN:  Correct, Your Honor.  The

8    problem that lies within is the collateral requests for

9    records.

10              THE COURT:  Take time.

11              PROBATION OFFICER HOGAN:  Those take time.

12              THE COURT:  Yeah.

13              PROBATION OFFICER HOGAN:  So we would request the

14   full time period for this.

15              THE COURT:  Okay.

16              All right.  So, Mr. Nash, let me explain to you

17   what's gonna happen.  There will be a presentence

18   investigation.  And what happens is Mr. Hogan, who is the

19   presentence report-writer in your particular case, will

20   contact you, and that will be arranged through your attorney.

21   And obviously because of how we are doing things now and also

22   with you in California, I presume that will be either by phone

23   or by video.

24              But there will be an interview.  You are required to

25   be honest and truthful during that interview, but you do need

1  to know that you have the absolute right to have your attorney

2  present with you during that entire interview process.  And if

3  there's any time, just like today, if there's any time where

4  you feel like you need to talk to your attorney outside the

5  presence of the probation officer, you can certainly just say,

6  "Hey, I need a second," and then you and John can go and talk

7  about what you need to talk about.

8          But basically what will happen is he will ask you a

9  whole series of questions.  There are some forms you're gonna

10 have to fill out, releases that Mr. Hogan then will use to get

11 information.  And he will contact family members, friends,

12 obviously you.  The victim, I suppose, in this case as well

13 might be contacted.  All of this information will be gathered

14 and put together in a report.  It will also contain whatever

15 criminal history you might have, and this all gets put

16 together in a report.

17         That report in draft form will go to your attorney

18 and the attorney for the government, and you have a chance to

19 make objections.  And objections can be factual, that may or

20 may not impact guidelines, or they can be legal, which almost

21 always impacts the guidelines.  And so there's an informal

22 process of working that out, and at the end of the informal

23 process the probation officer can either accept the

24 objections, modify the report, or decline to accept them and

25 he will just note them, then.

1              At that point the report becomes finalized.  It will
2     come to me.  It will also go to your attorney and the attorney
3     for the government.  And then at that point if there are any
4     remaining objections that need to be handled, we'll just
5     handle that at sentencing.  And as part of the sentencing
6     process like I described, the guidelines have to be
7     calculated.  As part of that, I will resolve any objections
8     one way or the other, and then we'll proceed to sentencing.
9              So all of that takes a little bit of time, as you
10    can guess.  And so your sentencing in this matter will be
11    August 7 at 10 a.m. here in Missoula.
12             And so I believe, Brian, that I would calculate the
13    presentence report draft to be done by July 10?  Does that
14    work for you?
15             PROBATION OFFICER HOGAN:  Yes.
16             THE COURT:  Okay.
17             All right.  Any questions about that?
18             THE DEFENDANT:  No.
19             MR. RHODES:  Your Honor, I'm not positive but I
20    believe I'll be on vacation August 7, so I may be filing a
21    motion to reset the hearing.
22             THE COURT:  I didn't know we were allowed vacations
23    anymore.  I thought we were vacationing in our homes.
24             MR. RHODES:  Yeah.
25             THE COURT:  Okay.  That's fine.  Yeah, if that date,

1    if that date needs to be moved, it can certainly be moved.

2                MR. RHODES:  Thank you.

3                And with regard to sentencing, Your Honor -- and we

4    would, of course, file a motion, but I anticipate requesting

5    that Mr. Nash be again permitted to appear via video

6    conference.

7                THE COURT:  And as long as there's no objection from

8    the United States, that's fine with me.

9                MR. RHODES:  Thank you, Your Honor.

10               THE COURT:  All right.

11               Okay.  And no problem with continued release, I

12   presume?

13               MR. WELDON:  That's correct, Your Honor.

14               THE COURT:  All right.

15               MR. WELDON:  The only thing that we would ask is

16   that the standard conditions continue to apply, including no

17   contact with the victims that have been identified.

18               THE COURT:  Yes.

19               So, Mr. Nash, all of the conditions that you -- that

20   I previously released you on?

21               THE DEFENDANT:  (No response.)

22               THE COURT:  Mr. Nash, are you still there?

23               THE DEFENDANT:  Okay.  Yes, Your Honor.

24               THE COURT:  So all of those conditions remain in

25   full force and effect.  So make sure that you abide by them

 1  and we won't have any problems.  Okay?

 2          THE DEFENDANT:  I will continue to do that.  Thank

 3  you, Your Honor.

 4          THE COURT:  All right.  Thank you very much.

 5          Anything else?

 6          MR. RHODES:  No, Your Honor.  Thank you.

 7          MR. WELDON:  No, Your Honor.  Thank you.

 8          THE COURT:  All right.  We'll be in recess.

 9      (Proceedings were concluded at 2:45 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      TRANSCRIBER'S CERTIFICATE

2              I, JoAnn Jett Corson, certify that the foregoing

3      transcript is an accurate transcription, to the best of my

4      ability, from the digital audio recording of the proceedings

5      given at the time and place hereinbefore mentioned; and that a

6      certified copy of this transcript will be filed electronically

7      with the Court.

8              I further certify that I am not attorney for, nor

9      employed by, nor related to any of the parties or attorneys to

10     this action, nor financially interested in this action.

11             IN WITNESS WHEREOF, I have set my hand at Missoula,

12     Montana this 23rd day of November, 2021.

13

14                              /s/ JoAnn Jett Corson

15                              _____
                                JoAnn Jett Corson
16                              United States Court Reporter

17

18

19

20

21

22

23

24

25